UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| | : |
| Plaintiff, | : No. 08-CV-09961 (GBD) |
| | : |
| -against- | : ECF FILED |
| | : |
| DAVID LEE, KEVIN P. CASSIDY, | : ORAL ARGUMENT REQUESTED |
| EDWARD O'CONNOR and | : |
| SCOTT CONNOR, | : |
| | : |
| Defendants. | : |
| | : |

**DEFENDANT EDWARD O'CONNOR'S MEMORANDUM OF LAW IN
<u>SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT</u>**

McCormick & O'Brien, LLP

Liam O'Brien
Marni Rae Robin
42 West 38th Street, Suite 701
New York, New York 10018
Tel: (212) 286-4471
Fax: (212) 504-9574

*Attorneys for Edward O'Connor*

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................... 1

II.  RELEVANT FACTUAL ALLEGATIONS .............................................................. 2

   A.  The Alleged Scheme to Defraud BMO.................................................................. 3

   B.  The Alleged Deception of Optionable Shareholders ............................................. 5

   C.  O'Connor's Alleged Misrepresentations to Optionable's Auditors........................ 6

   D.  O'Connor's Alleged Fraud on the NYMEX in the Sale of Optionable Stock........ 6

III. ARGUMENT ............................................................................................................ 7

   A.  The Complaint Fails to Plead the Predicate Securities Fraud with Requisite
       Particularity Pursuant to Rule 9(b) ...................................................................... 9

       1.  The Complaint Fails Adequately to Plead a Material Misstatement of Fact .. 11

       2.  The Complaint Fails Adequately to Plead Omission of a Material Fact ........ 13

       3.  The Complaint Fails Adequately to Plead a Fraudulent Scheme ................... 15

       4.  The Complaint Fails Adequately to Plead Scienter ....................................... 16

       5.  The Complaint Fails Adequately to Plead "in Connection with" the Purchase
          or Sale of a Security ..................................................................................... 18

   B.  The Complaint Fails to Plead Securities Fraud on Optionable Shareholders with
       Requisite Particulariy Pursuant to Rule 9(b) ...................................................... 19

   C.  The Complaint Fails to Plead Fraud Concerning the Sale of Optionable Stock to
       the NYMEX with Requisite Particularity Pursuant to Rule 9(b).......................... 22

   D.  The Allegations of Aiding and Abetting Liability against O'Connor for the
       Purported Fraud by BMO and Optionable Also Fail ........................................... 23

IV. CONCLUSION......................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945 (1980) ........................................................ 23

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47 (2d Cir. 1995) ......................................... 16, 17

*Armstrong v. McAlpin,* 699 F.2d 79 (2d Cir. 1983) ......................................................... 23

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87 (2d Cir. 2007) ...................... 7, 10

*Azrielli v. Cohen Law Offices,* 21 F.3d 512 (2d Cir. 1994) ............................................. 18

*Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978 (1988)...................................... 14, 15

*Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955 (2007) ....................................................... 7, 8

*Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42 (2d Cir. 1991) .............................. 7

*In re NYSE Specialists Sec. Litig.,* 503 F.3d 89 (2d Cir. 2007) ................................... 8, 24

*In re Regeneron Pharm. Inc. Sec. Litig.,* No. 03 Civ. 3111, 2005 WL 225288 (S.D.N.Y. 2005) ........................................................................................................................ 15

*Kalnit v. Eichler,* 264 F.3d 131 (2d Cir. 2001) ............................................................... 17

*Luce v. Edelstein,* 802 F.2d 49 (2d Cir. 1986) ................................................................ 10

*Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir. 1993) ........................................ 10

*Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000) ............................................ 16, 17, 18

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282 (S.D.N.Y. 2000), *aff'd* 242 F.3d 366 (2d Cir. 2001) .................................................... 10

*Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529 (2d Cir. 1999).................................. 16

*Rombach v. Chang,* 355 F.3d 164 (2d Cir. 2004) ............................................................ 10

*SEC v. Collins & Aikman Corp.,* 524 F.Supp.2d 477 (S.D.N.Y. 2007)............... 10, 16, 19

*SEC v. First Jersey Sec.,* 101 F.3d 1450 (2d Cir. 1996) .................................................. 17

*SEC v. Monarch Funding Corp.,* 192 F.3d 295 (2d Cir. 1999) ........................... 10, 19, 23

*SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899 (2002) .................................................. 16

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.,* 167 F.Supp.2d 639 (S.D.N.Y. 2001) ... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499 (2007) ................................. 7

*TSC Industries v. Northway,* 426 U.S. 438 (1976) ........................................... 13

*United States v. Dist. Council of NYC,* No. 90 civ. 5722, 2007 WL 2697135 (S.D.N.Y. 2007) ...................................................................................................................... 24

*United States v. Bilzerian,* 926 F.2d 1285 (2d Cir. 1991)................................................ 13

**Statutes**

15 U.S.C. § 77q(a) ....................................................................................... 22

15 U.S.C. § 78j(b) ....................................................................................... 9, 16, 18

17 C.F.R. § 240.10b-5................................................................................... 9, 11, 15, 18

Fed.R.Civ.P. 9(b) ........................................................................................ 2, 9

Fed.R.Civ.P. 12(b)(6)................................................................................... 2

## I.  __INTRODUCTION__

Defendant Edward O'Connor ("O'Connor") submits this Memorandum of Law in support of his motion to dismiss the Complaint against him filed by Plaintiff Securities and Exchange Commission ("SEC" or "Plaintiff") on or about November 18, 2008 ("Complaint" or "Cpt.").

In the Complaint, the SEC alleges violations of the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended (the "Exchange Act") and various rules respectively promulgated thereunder arising out of an alleged scheme by the Defendants to defraud the Bank of Montreal ("BMO"). In this fraudulent scheme, Defendant David Lee ("Lee"), formerly a senior commodities trader employed by BMO, allegedly inflated the value he assigned to the positions in the book of natural gas options he traded for BMO. BMO's risk management personnel allegedly sought to independently verify Lee's valuations through Optionable, Inc. ("Optionable") – one of BMO's commodities brokers. Defendants Kevin Cassidy ("Cassidy"), Scott Connor ("S. Connor") and O'Connor (collectively, the "Optionable Defendants"), as officers and/or employees of Optionable, allegedly colluded with Lee to conceal from BMO that the quotes the Optionable Defendants provided to BMO's risk management personnel were not independent quotes of certain options positions in Lee's book as purported to be, but rather were valuations of such positions the Optionable Defendants obtained from Lee. Plaintiff alleges that securities fraud occurred under these circumstances because, as a result of Defendant's alleged scheme, BMO's publicly reported financial results were materially misstated.

However, it is clear from a review of the allegations contained in the Complaint that the SEC has failed to allege adequately-pled facts supporting its conclusion that O'Connor engaged in any scheme to defraud BMO in violation of federal securities laws and rules. Indeed, the Complaint fails to allege facts showing that O'Connor: (1) knew that Lee was defrauding BMO by inflating the value of his book; (2) colluded with Lee to assist him in his fraud of BMO; (3) understood BMO's verification process or BMO's expectations from him in that process; or (4) provided BMO with inaccurate quotes of the positions BMO sought to verify. Therefore, for the reasons set forth in greater detail below, these claims against O'Connor fail as a matter of law.

The SEC has attempted to bootstrap additional claims against O'Connor labeled as violations of federal securities laws and rules that are predicated upon the inadequately pled and unproven scheme to defraud BMO. Thus, these additional claims against O'Connor also may not stand as a matter of law. Accordingly, O'Connor respectfully requests that the Court grant an order dismissing the claims against O'Connor in their entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) ("Rules 12(b)(6) and 9(b)").

## II.    RELEVANT FACTUAL ALLEGATIONS

When parsed, it appears that the Complaint essentially makes the following four main allegations against O'Connor:

1. O'Connor engaged in a fraudulent scheme with the co-defendants to overvalue BMO's natural gas options portfolio resulting in a material overstatement of BMO's publicly reported financial results in year 2006 and the first quarter of 2007;

2. O'Connor defrauded Optionable's public shareholders by concealing Optionable's role in the fraudulent scheme in its periodic reports filed with the SEC;

3. O'Connor made material misstatements to Optionable's auditors when he was interviewed for its 2006 audit; and

4. O'Connor defrauded the NYMEX in its April 2007 purchase of Optionable shares from a company controlled by O'Connor by misrepresenting to the NYMEX that Optionable's periodic reports were materially accurate even though such reports did not disclose the scheme to defraud BMO.

Each of these four main claims against O'Connor hinge upon Plaintiff's allegations that O'Connor engaged in a scheme to defraud BMO. Since the SEC has failed to plead such allegations of securities fraud with requisite particularity against O'Connor, all of the other allegations predicated upon the purported fraud also fail as a matter of law.

The allegations referenced herein pertain only to the claims alleged against O'Connor.

### A.   <u>The Alleged Scheme to Defraud BMO</u>

According to the Complaint, as part of his responsibility for "marking" his book of natural gas options daily (i.e., assigning a value to each position in the book), Lee provided BMO with mark-to-model valuations of certain positions in his book for which there was no readily ascertainable and reliable market price. Lee allegedly manipulated the data for the valuations in order to inflate the value of the positions (and ultimately, to receive greater compensation for the purported trading profits). Cpt. ¶¶ 18, 20-22. Twice a month, BMO's risk management personnel allegedly sought to verify the accuracy of the valuations ("marks") of certain natural gas positions Lee provided to BMO by obtaining what BMO believed to be independent valuations ("quotes") of those positions by various third parties, one of which was Optionable. Cpt. ¶ 2, 24. Allegedly, Lee would email to Optionable employees the list he received from BMO's back office of the positions it sought to verify, and Lee included in that list, valuations that he assigned to

such positions. Optionable employees, later the same day, allegedly would email the list of those positions with Lee's valuations to BMO's back office and to Lee (the "u-turn" process). Cpt. ¶ 24. The Complaint alleges that this u-turn process had been used by Lee and Optionable during BMO's price verification process from 2003 until April 2007. Cpt. ¶ 22.

As a result of Defendants' alleged fraud, BMO allegedly materially overstated its net income and other financial results in its public filings with the SEC for the year 2006 and the first quarter of 2007. According to the complaint, in May 2007, BMO announced a restatement of its net income and revenue for the first quarter of 2007. Cpt. ¶ 23.

As for O'Connor's participation in the purportedly fraudulent scheme, the Complaint specifically alleges that "O'Connor handled the mechanics of the 'u-turn' process for a period of time in 2005, and [S.] Connor took over that role later in 2005…. O'Connor gave [S.] Connor the names of the BMO personnel to whom [S.] Connor should send the quotes." Cpt. ¶ 26. Allegedly, S. Connor retyped Lee's marks and ran his retyped document by Lee for his approval before forwarding it to BMO's back office, and "[i]n some cases, Cassidy or O'Connor would also review and approve [S.] Connor's work." Allegedly, no one at Optionable independently surveyed quotes available in the market for Lee's positions. Cpt. ¶ 27. Allegedly, the motive for O'Connor's participation in this "fraudulent scheme," was "to do whatever it took" to keep the business of Optionable's largest customer, BMO, whose trading came to Optionable through Lee. Cpt. ¶ 1.

**B.**     **The Alleged Deception of Optionable Shareholders**

Plaintiff alleges that O'Connor signed Optionable's Form 10-KSB for the years ending December 31, 2005 and December 31, 2006 and Optionable's Form 10-QSB for the quarters ending March 31, 2005 and June 30, 2006. Cpt. ¶¶ 39-40, 93. Plaintiff concludes that the foregoing Form 10-KSBs "falsely touted the independent derivatives valuation services that Optionable supposedly provided to BMO." Cpt. ¶ 39. In support of this conclusion, Plaintiff quoted a passage from Optionable's 2006 10-KSB that includes the statement: "At the request of several of our existing clients, … we can periodically assist our clients in valuing their positions in the natural gas derivatives market." *Id.* Optionable's 2005 10-KSB allegedly contains a substantially identical statement. *Id.* Plaintiff concludes that such statements are false and misleading because "BMO was the principal client for whom those 'valuation services' were performed, and Optionable was secretly defrauding BMO, … rather than 'assisting' BMO in 'valuing' BMO's positions." *Id.* The Complaint further alleges that the periodic reports that O'Connor signed (for quarters ending March 31, 2005 and June 30, 2005) also were materially false and misleading because they contained a financial statement footnote disclosing that a single customer, BMO, accounted for a large portion of Optionable's revenues, but did not disclose that such business from BMO was dependent upon Optionable's conspiracy with Lee to defraud BMO. Cpt. ¶ 40-41.

**C.**     **O'Connor's Alleged Misrepresentations to Optionable's Auditors**

In one sentence, Plaintiff alleges that O'Connor made misrepresentations that he had no knowledge of any management fraud affecting Optionable to Optionable's auditors when they interviewed O'Connor for the company's 2006 audit. Cpt. ¶ 42.

### D.   O'Connor's Alleged Fraud on the NYMEX in the Sale of Optionable Stock

Allegedly, on April 10, 2007, O'Connor sold approximately 1.8 million shares of Optionable stock to the NYMEX through a company he controls, Ridgecrest Capital, Inc. ("Ridgecrest"), for approximately $4.9 million – *amounting to $2.69 per share*.[1] Plaintiff alleges that O'Connor made false representations in the Stock Warrant Purchase Agreement with NYMEX that Optionable's SEC filings were materially accurate and that Optionable had complied in all material respects with the Sarbanes-Oxley Act of 2002 ("SOX Act") but failed to disclose to the NYMEX the purported scheme to defraud BMO and its potential impact on Optionable's business. Cpt. ¶ 43 (emphasis added). In support of these allegations, the Complaint further alleges that Optionable's share price declined 82%, from $4.64 to $0.85 per share between May 9th and May 10th, two days following Optionable's announcement on May 8, 2007 that BMO was suspending its business relationship with Optionable and that such a suspension would have an adverse effect on Optionable's business. Cpt. ¶ 44.

The Complaint fails to note the critical fact that the NYMEX's own conduct severely impacted upon Optionable's share price. As part of the April 10, 2007 Stock Warrant Purchase Agreement between Optionable and the NYMEX, Optionable issued a warrant to the NYMEX to purchase up to 40% of Optionable's outstanding common stock *in exchange for*, among other things, the NYMEX's agreement to host Optionable's OPEX electronic trade matching and brokerage system ("OPEX") and provide services necessary to interconnect OPEX with the NYMEX's market gateway to trading and

---

[1] According to Optionable's publicly filed reports with the SEC, subsequent to the sale of Optionable shares to the NYMEX, O'Connor continued to beneficially own approximately 3.8 million shares of Optionable stock, approximately 2.68 million of which are owned through Ridgecrest.

clearing services. *See* Optionable's Form 8-K filed with the SEC on April 16, 2007 at 2 as Exh. A to Marni Rae Robin, Esq.'s Declaration ("Robin Decl.") filed herewith and in support hereof. However, on May 9, 2007, Optionable publicly declared that the NYMEX, a 19% stakeholder in Optionable, would begin to offer options trading on a competing platform to Optionable's OPEX trading system, and that Optionable was unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition. *See* Optionable's Form 8-K filed with the SEC on May 9, 2007 as Robin Decl. Exh. B.[2]

Finally, Plaintiff alleges that, as a result of subsequent events, including the NYMEX's announcement of its withdrawal of its appointed director on Optionable's board of directors on May 14, 2007, which, on the following day, the press attributed to Cassidy's prior criminal record which allegedly had not been previously disclosed to the public or the NYMEX, Optionable's share price fell below 50 cents on May 15, 2007 and has not recovered since. Cpt. ¶ 45.

## III.   ARGUMENT

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007)). Thus, the old standard that a complaint can be dismissed if

---

[2] In addition to the face of the pleadings, in a motion to dismiss, the Court also may consider the full text of "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2509 (2007). Upon a motion to dismiss a complaint alleging securities fraud, a district court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC…." *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir. 1991).

there is "no set of facts" that plaintiff could prove "which would entitle him to relief" is

no longer applicable. *Bell Atl. Corp.,* 127 S.Ct. at 1969. While the Court is constrained to

accept as true all factual allegations asserted in the Complaint (although O'Connor

disputes many of them), the Court need only draw reasonable inferences in Plaintiff's

favor, and is <u>not</u> required to afford "[l]egal conclusions, deductions or opinions couched

as factual allegations... a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.,*

503 F.3d 89, 95 (2d Cir. 2007).

     Plaintiff claims O'Connor committed the <u>predicate scheme to defraud BMO</u> in

violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

As bootstrap claims thereto, Plaintiff <u>directly</u> claims O'Connor committed violations of:

1. Section 17(a) of the Securities Act (relating to the sale of Optionable shares to NYMEX);

2. Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (relating to Optionable's shareholders);

3. Section 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated thereunder (causing the falsification of books and records of BMO);

4. Section 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated thereunder (causing the falsification of books and records of BMO);

5. Rule 13b2-2 promulgated under the Exchange Act (for misstatements to Optionable auditors);

6. Rule 13a-14 promulgated under the Exchange Act (for misstatements in signed certifications on Forms 10-QSB for March 31, 2005 and June 30, 2005).

     Finally, the Complaint alleges primary violations of the securities laws by BMO

and Optionable for alleged frauds on the investing public through their respective SEC

filings resulting from the alleged fraudulent scheme and for related books and records

violations. Significantly, Plaintiff does <u>not</u> name either BMO or Optionable directly as

defendants for these numerous claimed violations of securities laws. However, by additional bootstrapping to the claimed predicate fraud on BMO, Plaintiff claims that O'Connor further violated the federal securities laws by aiding and abetting, pursuant to Section 20(e) of the Exchange Act, the primary securities laws violations of BMO and Optionable, as follows:

1. Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (relating to BMO);

2. Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (relating to Optionable);

3. Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-16 promulgated thereunder (relating to BMO);

4. Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 (relating to Optionable);

5. Section 13(b)(2)(A) of the Exchange Act (relating to BMO);

6. Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act (relating to Optionable).

All of the claims above are directly predicated on a poorly asserted and otherwise unproven claim of securities fraud on BMO that is fatally flawed as a matter of law. Without a properly pled foundational premise, the additional direct and aider and abettor claims against O'Connor must fall like a house of cards.

**A.     The Complaint Fails to Plead the Predicate Securities Fraud with Requisite Particularity Pursuant to Rule 9(b)**

Because the predicate claim alleged against O'Connor is a violation of Exchange Act § 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], i.e. securities fraud, the heightened pleading standard of Rule 9(b) applies. Rule 9(b) requires the Plaintiff to allege "with particularity" the circumstances constituting the alleged fraud. Fed.R.Civ.P. 9(b). The particularity requirement of Rule 9(b) is substantial: the

Complaint must "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993). Where a complaint alleges fraudulent omissions, Rule 9(b) requires the Plaintiff to specify: "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what the defendant obtained through the fraud." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 293 (S.D.N.Y. 2000), *aff'd* 242 F.3d 366 (2d Cir. 2001). Allegations that are conclusory or unsupported by factual assertions are insufficient. *ATSI Commc'ns,* 493 F.3d at 99 (citing *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986). The SEC has failed to satisfy these requirements.

To state a claim for violation of § 10(b) or Rule 10b-5, Plaintiff must plead that O'Connor "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Collins & Aikman Corp.,* 524 F.Supp.2d 477, 485 (S.D.N.Y. 2007) (citing *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999)). As set forth above, each of these elements must be pled with particularity pursuant to Rule 9(b). It appears from the overall allegations contained in the Complaint that the SEC purports to meet such requirements through three theories: (1) the quotes for particular options positions that O'Connor sent to BMO were false or materially inaccurate, and thus fraudulent (material misstatement); (2) O'Connor misled BMO

10

concerning the source of the quotes he forwarded to its back office (material omission); and/or (3) O'Connor (and the other Defendants) conspired with Lee to engage in the fraud on BMO in order to prop up Lee's book and thereby, his personal compensation in return for Lee's/BMO's continued business (fraudulent scheme). None of these theories withstand analysis.

    1.  The Complaint Fails Adequately to Plead a Material Misstatement of Fact

   The SEC has failed to allege with requisite particularity that a material misstatement or omission of material fact was made by O'Connor. Rule 10b-5 provides that it is unlawful for any person, "directly or indirectly" to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b).

   First, the Complaint fails to specifically allege that O'Connor made a misstatement of material fact in connection with the valuations provided to BMO. Plaintiff woefully has failed to allege any such theory of fraud with requisite particularity under Rule 9(b). Initially, there are no specific allegations of statements made by O'Connor, i.e. quotes sent to BMO, that Plaintiff contends were fraudulent. Because Plaintiff has failed to identify a single quote purportedly sent by O'Connor to BMO, the SEC also has failed to show how such information was false, and therefore, fraudulent. Indeed, none of the very general or implied factual allegations against O'Connor supports a conclusion that the information he forwarded to BMO was not accurate, i.e., outside the range of market prices for such positions at that time. Additionally, no specific facts are

alleged to identify where and when such (non-alleged) statements were made; the blanket statement that "O'Connor handled the mechanics of the 'u-turn' process for a period of time in 2005" simply will not suffice. Cpt. ¶ 26.

Moreover, the Complaint fails to plead facts sufficient to support an inference that the valuations/quotes that O'Connor provided were false. According to the Complaint, BMO did not subscribe to a multi-contributor independent valuation service ("Totem") until the latter part of 2006. Cpt. ¶¶ 21, 29. Even the SEC's overly general allegations concerning O'Connor's conduct confines it to "a period of time" in early to mid-2005 (as S. Connor took over the u-turn process "later in 2005"). Cpt. ¶ 26. Thus, the comparisons of the valuations provided to BMO by Lee and purportedly verified by Optionable employees with those of Totem, which are alleged to have taken place in 2006, did not include any purported valuations provided by O'Connor. *See* Cpt. ¶ 29. Furthermore, according to the Complaint, BMO's alleged overstatement of its income was confined to the years 2006 and first quarter of 2007. Cpt. ¶ 23. Finally, the SEC has confined Lee's overvaluation of his book to "the six quarters from November 1, 2005 through April 30, 2007" (Cpt. ¶ 23), which, even in the light most favorable to Plaintiff, specifically excludes the general period of time in which the Complaint alleges that O'Connor provided BMO with valuations. Moreover, even if the SEC had adequately pled a misstatement of fact by O'Connor, any such misstatement would not be material, for the reasons set forth herein below. Thus, Plaintiff has failed to adequately plead a material misstatement of fact by O'Connor as a matter of law.

2.      The Complaint Fails Adequately to Plead Omission of a Material
        Fact

Likewise, Plaintiff fails to plead that O'Connor made a material omission of fact in accordance with Rule 9(b) by failing to advise BMO that the purported quotes O'Connor sent to its back office actually came from Lee and were not obtained independently from the market. The SEC's conclusory averments that O'Connor made omissions of material fact places the cart before the horse: if the valuations sent by O'Connor to BMO were within the range of market prices for the derivatives in question, there can be no fraud, and therefore, the originating source of the information is irrelevant.

Such theory of fraud based on a material omission fails for two additional reasons: (1) lack of particularity of allegations pursuant to Rule 9(b); and (2) the alleged omission was not material to BMO.

Similar to the reasons set forth above concerning misstatements, in the context of omissions, the Complaint fails to allege with specificity any communications between O'Connor and BMO, let alone any communications that would call for the alleged omissions to be stated in order not to mislead BMO. Thus, the claim that O'Connor misrepresented the source of his valuations by omission fails to meet the particularity standard required by Rule 9(b).

Moreover, the Complaint fails to allege specific facts sufficient that any such omission was material to BMO. "An omitted fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important in making an investment decision." *United States v. Bilzerian,* 926 F.2d 1285, 1298 (2d Cir. 1991) (citing *TSC Industries v. Northway,* 426 U.S. 438, 449 (1976)); *Basic Inc. v. Levinson,*

485 U.S. 224, 231-32, 108 S.Ct. 978 (1988) (expressly adopting the *TSC Industries* standard of materiality for violations of Exchange Act § 10(b) and Rule 10b-5). According to the SEC's theory of securities fraud, the alleged omission was material because it impacted BMO's publicly reported financial results. However, contrary to the suggestive allegations made in the Complaint by the SEC in connection with the impact of Lee's alleged overvaluations on BMO's net income (Cpt. ¶ 23), BMO did not find the impact of Lee's trading losses to be material to BMO's overall income.

Significantly, on May 17, 2007, BMO filed a Form 6-K with the SEC issuing a press release disclosing its restatement of its financial results for the first quarter of 2007 relating to commodity trading losses, and further stated that such losses did not have a material impact on periods prior to the first quarter of 2007.[3] As a result of this public disclosure, the SEC, by letter dated October 31, 2007, requested from BMO its "materiality analysis" of the impact of the commodity trading losses on periods prior to fiscal year 2007 and how BMO determined that the effect was not material. In response to the SEC's letter inquiry, BMO, by letter dated November 30, 2007, stated that "[t]he losses attributable to periods prior to fiscal year 2007 are a $203 million [CAD] reduction in trading revenue and a $94 million [CAD] reduction in net income." Quantitatively, BMO explained to the SEC, the misstatement in its publicly reported financial condition "does not significantly impact the trend in earnings as net income in the last three fiscal years was **$2.3 billion [CAD]** in 2004; **$2.4 billion [CAD]** in 2005 and **$2.7 billion [CAD]** in 2006" (emphasis added). BMO continued, qualitatively, the misstatements were not material to the market demonstrated by BMO's closing share price for the three

---

[3] In ¶ 23, the SEC sets forth allegations derived from this restatement announcement in an attempt to minimize the impact of BMO's statement by emphasizing what appear to be large figures when taken out of context of BMO's overall net income. *See* discussion *infra.*

days before and after BMO's May 17th public announcement regarding the commodities losses which ranged from $69.70 to $68.88 with an average price of $69.25. The SEC apparently determined that BMO's materiality analysis was satisfactory, and indicated as much in its letter to BMO dated December 20, 2007. A copy of the foregoing correspondences publicly filed with the SEC are annexed to the Robin Decl. as Exhibit C.

Therefore, since the restatement of BMO's income allegedly due to Lee's overvaluations of his book and the Defendants' alleged conduct did not materially impact BMO's financial condition, any purported omission made by O'Connor in connection therewith is immaterial as a matter of law. *See In re Regeneron Pharm. Inc. Sec. Litig.,* No. 03 Civ. 3111, 2005 WL 225288, at *21 (S.D.N.Y. 2005) ("Material facts include any fact that in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities") (internal quotations omitted). Accordingly, for all of the foregoing reasons, Plaintiff has failed to allege a material omission made by O'Connor in accordance with Rule 9(b).

### 3.   The Complaint Fails Adequately to Plead a Fraudulent Scheme

Under the third theory of liability, O'Connor purportedly committed securities fraud by engaging in a scheme with the co-defendants to defraud BMO. Such theory is predicated on Exchange Act Rules 10b-5 (a) and (c), which prohibits the use of "any device, scheme, or artifice to defraud," and engaging in "any act, practice, or course of business which operate or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5 (a), (c). However, analysis of such theory of scheme liability must be confined to the text of the statute from which it derives, i.e. § 10(b) of the Exchange Act. Section 10(b) provides that it is unlawful for any person "directly or indirectly" to employ "any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Thus, Rule 10b-5 can not expand liability beyond the scope of the statute, and § 10(b) extends only to persons who actually made material misstatements or employed deceptive devices. *Collins & Aikman Corp.,* 524 F.Supp.2d at 486 (citing *SEC v. Zandford,* 535 U.S. 813, 816, 122 S.Ct. 1899 (2002)).

Accordingly, "[p]articipation in a scheme can thus be sufficient for liability under section 10(b) only if that participation took the form of actions or statements that were independently deceptive or fraudulent." *Collins & Aikman Corp.,* 524 F.Supp.2d at 486. The only conduct alleged by O'Connor demonstrating any purported participation in the purportedly fraudulent scheme (other than discussed in great detail above) is O'Connor's allegedly giving S. Connor the names of BMO's back office personnel (Cpt. ¶ 26), and the non-specific reference to O'Connor purportedly "reviewing O'Connor's work" (Cpt. ¶ 27). None of these allegations demonstrate any specific conduct by O'Connor in furtherance of an alleged scheme to defraud, nor do they support an inference that O'Connor's conduct was independently deceptive or fraudulent. Therefore, the SEC's fraudulent scheme theory fails to meet the heightened pleading standards of Rule 9(b) as a matter of law.

4.   The Complaint Fails Adequately to Plead Scienter

In this Circuit, pursuant to Rule 9(b), a claim of securities fraud must allege facts that give rise to "a strong inference of fraudulent intent." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995)). "The scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud,' or knowing misconduct." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir. 1999) (quoting *SEC v. First Jersey Sec.,* 101 F.3d 1450, 1467

(2d Cir. 1996)). The requisite "strong inference" of scienter "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak,* 216 F.3d at 307 (quoting *Acito*, 47 F.3d at 52).

Arguably, the Complaint alleges that the motive of "Optionable's management, led by Cassidy," for engaging in the purported fraud was "to do whatever it took to keep Lee happy" thereby retaining the business of BMO, its largest customer. Cpt. ¶ 1. However, motives that are generally possessed by most corporate directors and officers do not suffice; rather Plaintiff must assert a concrete and personal benefit to O'Connor resulting from the fraud. *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir. 2001). Retention of a company's largest customer is clearly a motive that is generally possessed by most corporate officers and directors, and therefore, such a motive alone will not suffice. Moreover, the Complaint does not make any allegations that support the inference that O'Connor achieved a "concrete and personal benefit" from the alleged fraud on BMO. The only personal benefit to O'Connor specifically alleged in the Complaint is the proceeds from his sale of Optionable shares to the NYMEX. Cpt. ¶ 47. This "benefit" O'Connor received in or about April 2007 is not alleged to have any direct correlation to O'Connor's alleged participation in the purported fraud in 2005. Thus, motive for O'Connor to commit fraud has not been sufficiently alleged.

Likewise, the Complaint fails to allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Conscious misbehavior "encompasses deliberate illegal behavior." *Novak,* 216 F.3d at 308. None has been alleged against O'Connor in the Complaint. Whereas, for recklessness, Plaintiff must

allege conduct by O'Connor "which is highly unreasonable and which represents an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotations omitted). Indeed, the Complaint fails to allege specific facts that: (1) O'Connor was aware that Lee allegedly had been inflating the values he assigned to his book of natural gas options; (2) O'Connor was informed by BMO or anyone else that BMO expected O'Connor to seek independent quotes for such positions in the marketplace rather than simply review the valuations provided by Lee for errors based on his knowledge of the market at the time; and (3) that O'Connor communicated to BMO that his valuations were based on independent quotes that he observed in the market. Such allegations would be necessary to show O'Connor's recklessness by circumstantial evidence under the alleged circumstances. Since no such allegations have been pled, the Complaint fails to sufficiently allege scienter for these reasons as well.

5.   The Complaint Fails Adequately to Plead "in Connection with" the Purchase or Sale of a Security

The final element of § 10(b) and Rule 10b-5 that must be pled with particularity under Rule 9(b) is that the alleged fraud was made "in connection with" the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To satisfy the "in connection with" element, the SEC must allege that "[O'Connor] has committed a proscribed act in a transaction of which the pledge of a security is a part." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir. 1994). It is patently clear from a review of the Complaint that the few allegations set forth against O'Connor specifically do not involve any valuations for natural gas options positions communicated to BMO that are

"in connection with" any particular transaction that O'Connor or Optionable brokered for BMO. Thus, the SEC has failed to adequately allege this element as well.

For all of the foregoing reasons, the SEC has failed to allege its predicate claim of securities fraud against O'Connor with particularity as required by Rule 9(b). Accordingly, not only does this claim fail as a matter of law, but so too do all of the other claims made against O'Connor in the Complaint as they are predicated upon the existence of a well-pleaded claim of securities fraud that is not shown here.

However, the following derivative claims against O'Connor also fail for other reasons as discussed below.

### B.   The Complaint Fails to Plead Securities Fraud on Optionable Shareholders with Requisite Particularity Pursuant to Rule 9(b)

The Complaint also alleges a claim of securities fraud pursuant to Exchange Act §10(b) and Rule 10b-5(b) against O'Connor for the purported material misstatements and/or material omissions made to Optionable shareholders in the publicly filed periodic reports that he signed. As set forth above, in order for this claim to stand, Plaintiff must plead with particularity that O'Connor made material misstatements and/or material omissions with scienter in connection with the sale or purchase of a security. *Collins & Aikman Corp.,* 524 F.Supp.2d at 485 (citing *Monarch Funding Corp.,* 192 F.3d at 308).

The alleged material misstatements made in the 10-KSB forms for the years ending December 31, 2005 and December 31, 2006 relate to the "independent derivatives valuation services" that Optionable purportedly falsely touted because, according to the SEC, BMO allegedly was the principal client for whom such "valuation services" were performed, and no such services actually were performed for BMO. Cpt. ¶ 39. However the language in the reports that the SEC relies upon actually states: "At the request of

several of our existing clients, … we can periodically assist our clients in valuing their positions in the natural gas derivatives market." *Id.* (emphasis added). Broken down, this statement clearly refers to several clients, not one, and BMO is not referenced any where as one of these "several clients." The SEC has failed to allege that Optionable has failed to provide valuation services to any client, other than BMO, for whom such services were requested of Optionable. Also significant is the use of the words "can assist" rather than "do assist" clients in valuing positions. Therefore, even assuming *arguendo* that Plaintiffs allegations concerning BMO's valuations are true (which O'Connor vehemently denies), the statements made by Optionable are not, in fact, false. Thus, the SEC has failed to allege any misstatements made by O'Connor through such 10-KSBs.

Similarly, the SEC alleges that material misstatements or omissions were made in the 10-QSBs that O'Connor signed as CEO for the quarters ending March 31, 2005 and June 31, 2005. Cpt. ¶¶ 40-41, 93. These alleged misstatements or omissions refer to the disclosure that a single customer, BMO, accounted for a large portion of Optionable's revenues during those periods. Cpt. ¶ 40. First, the SEC concludes that these reports failed to report that "Optionable's receipt of business from BMO was dependent on Optionable conspiring with Lee to defraud BMO." *Id.* However, a review of the Complaint quickly reveals that nowhere does the SEC allege with requisite specificity under Rule 9(b) that: (a) an agreement was entered into between Optionable (or O'Connor) and Lee for a *quid pro quo* arrangement in which Optionable would provide BMO with "verified" valuations obtained from Lee in exchange for brokerage business; and (b) Optionable obtained specific brokerage business from Lee as a direct result of specific valuations sent by Optionable to BMO pursuant to such a (non-existent)

agreement. Plaintiff's general, conclusory statement that "Optionable's management, led by Cassidy, was willing to do whatever it took to keep Lee happy" will not suffice under Rule 9(b).

The SEC also claims that the foregoing quarterly reports understated the extent of Optionable's financial dependence on BMO. Cpt. ¶ 41. In reaching this conclusion, the SEC posits that Optionable should have aggregated the commissions earned from counterparties to BMO's trades in the disclosed percentages of revenue derived from BMO. However, if Optionable had made a disclosure suggesting that that BMO was responsible for or otherwise generated revenues from counterparties, then it would have made a truly misleading and false statement. The SEC's logic suggests that BMO was the counterparty to each and every other Optionable client's transaction, yet no such allegation has been made. Thus, at the time these statements were made, losing BMO's business would not necessarily dictate the loss of commissions from counterparties (as suggested by the SEC, Cpt. ¶ 41), since BMO could have been replaced as a counterparty to a trade placed by another Optionable client. Moreover, the periodic reports also disclosed the percentage of revenue derived from other customers amounting to greater than 10%. If such customers were the counterparties to BMO's trades, then, according to the SEC's creative accounting logic, they too should be aggregated with BMO's revenue. This would lead to a true distortion of the revenues generated from Optionable's largest customers, rather than disclosing each customer's significant contribution to Optionable's revenues, as they were properly disclosed in the period reports in question. *See* Optionable Forms 10-QSB for the periods ending March 31, 2005 and June 30, 2005 at 7-8, annexed to the Robin Decl. as Exhs. D and E, respectively. Moreover, in direct

contrast to the SEC's allegations (Cpt. ¶ 41), these periodic reports do disclose that Optionable received incentive payments for deals executed on NYMEX and another exchange as "incentive receivables." Robin Decl. Exhs. D and E at 7. Where "allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.,* 167 F.Supp.2d 639, 646-647 (S.D.N.Y. 2001). The same is true here.

Additionally, for the reasons and analysis set forth in Section III.A.4. above, Plaintiff has failed to allege facts to support an inference of "fraudulent intent" by O'Connor for this claim, as well.

Thus, for the additional reasons set forth in this Section, the SEC has failed to allege that O'Connor violated § 10(b) or Rule 10b-5(b) through the periodic reports that he signed as an officer of Optionable.

### C. The Complaint Fails to Plead Fraud Concerning the Sale of Optionable Stock to the NYMEX with Requisite Particularity Pursuant to Rule 9(b)

The Complaint has alleged securities fraud pursuant to Securities Act § 17(a) in connection with O'Connor's sale, through Ridgecrest, of shares of Optionable common stock to the NYMEX in the April 10, 2007 Stock Warrant Purchase. Because the statutes are very similar, the same essential elements to show a violation of Exchange Act 10(b) and Rule 10b-5 are required to plead securities fraud under Securities Act § 17(a) in connection with the offer or sale of a security. *See* 15 U.S.C. § 77q(a). Thus, Plaintiff is required to allege sufficiently particularized facts showing that O'Connor: (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the offer or sale of a

security. *Monarch Funding Corp.,* 192 F.3d at 308. The only deviation is for §§ 17(a)(2) and (a)(3); for these subsections of the statute, no showing of scienter is required. *Id.; Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1956 (1980).

By this claim, the SEC alleges that O'Connor made material misrepresentations in the Stock Warrant Purchase Agreement with the NYMEX (that Optionable's SEC filings were materially accurate and that Optionable had materially complied with the SOX Act), because he failed to disclose to the NYMEX the purportedly fraudulent scheme with Lee and its potential impact on Optionable's business. Cpt. ¶ 43. As stated above, such circular argument presumes a properly pled claim for securities fraud on BMO, which, as is demonstrated above, does not exist here. Thus, this claim must also be dismissed as a matter of law.

Additionally, O'Connor reasonably can not be held to predict, and therefore, warn NYMEX of, future events. Moreover, NYMEX's conduct was a contributing factor for the severe drop in Optionable's share price in May, the extent of which can not be quantified from a reading of the Complaint and other public disclosures cited herein. Thus, the SEC's conclusory allegations to the contrary can not be sustained.

### D. The Allegations of Aiding and Abetting Liability against O'Connor for the Purported Fraud by BMO and Optionable Also Fail

In this Circuit, in order to establish a claim for aiding and abetting liability, Plaintiff must prove "(1) a securities law violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir. 1983). The SEC alleges that each of BMO and Optionable committed Exchange Act § 10(b) and Rule 10b-5 fraud – although,

curiously, neither were charged with same as named defendants – in connection with their respective public filings with the SEC.

First, BMO is alleged to have made material misstatements and omissions concerning its overstated financial statements during the period of the Defendants' purported fraud. Cpt. ¶ 51. The SEC fails to sufficiently allege a primary violation by BMO with respect to its alleged public disclosures because, as is set forth in detail above, BMO's restatements of its financial condition for periods prior to 2007 were not <u>material</u> misstatements. Although the analysis may end here, Plaintiff also fails to show O'Connor's "actual knowledge" in other than conclusory terms, stating that O'Connor "knew" that BMO's financial reports were misleading because of his alleged fraudulent conduct. Cpt. ¶ 52. Conclusory allegations need not be accepted by the Court as true. *NYSE Specialists,* 503 F.3d at 95. <u>Actual knowledge</u> is required to impose liability on an aider and abettor who does not owe a fiduciary duty to the defrauded party. *United States v. Dist. Council of NYC,* No. 90 civ. 5722, 2007 WL 2697135 (S.D.N.Y. 2007), at *17.

Similarly, Plaintiff has failed to adequately allege O'Connor's aiding and abetting Optionable's purported fraud by alleged misstatements in its periodic reports filed with the SEC. *See* Cpt. ¶ 58. For the reasons set forth in Section III.B. above, sufficient allegations of Optionable's primary liability have not been alleged. Moreover, although a recklessness standard is required in this instance, where O'Connor owes a fiduciary duty to Optionable (*see Id.* at *16), again, the Plaintiff has merely alleged same in conclusory terms which will not suffice. *See* Cpt. ¶ 59. Therefore, for these additional reasons, these claims also must be dismissed.

IV.     **CONCLUSION**

For the foregoing reasons, it is clear that the SEC has failed to allege facts sufficient to support its claimed violations of the securities laws against O'Connor, and therefore, the Complaint must be dismissed with prejudice and without leave to amend as against O'Connor.

Dated: New York, New York
      April 20, 2009

Respectfully submitted,

**McCormick & O'Brien, LLP**

By:     /s/ Marni Rae Robin
Liam O'Brien, Esq. (LO-3930)
Marni Rae Robin (MR-3461)
42 West 38th Street, Suite 701
New York, New York 10018
Tel: (212) 286-4471
Fax: (212) 504-9574
lobrien@mcoblaw.com
mrobin@mcoblaw.com

*Attorneys for Edward O'Connor*